Pamela MARSHALL, Plaintiff,

v.

Jo Anne B. BARNHART[1],
Commissioner of Social
Security, Defendant.

No. 1:01–CV–90049.

United States District Court,
S.D. Iowa,
Western Division.

Oct. 1, 2002.

1.  Jo Anne B. Barnhart became the Commissioner of Social Security on November 9, 2001. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure [Rule 43(c)(2) of the Federal Rules of Appellate Procedure], Jo Anne B. Barnhart should be substituted, therefore, for Acting Commissioner Larry G. Massanari as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

Joseph G. Basque, Legal Services Corp. of Iowa, Council Bluffs, IA, for plaintiff.

William C. Purdy, Assist. U.S. Atty., Des Moines, IA, for defendant.

### ORDER

PRATT, District Judge.

Plaintiff, Pamela Marshall, filed a Complaint in this Court on October 3, 2001, seeking review of the Commissioner's decision to deny her claim for Social Security benefits under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381 *et seq.* This Court may review a final decision by the Commissioner. 42 U.S.C. § 405(g). For the reasons set out herein, the decision of the Commissioner is reversed.

Plaintiff filed her applications for benefits on July 20, 1995. Tr. at 187–89. After the applications were denied initially and upon reconsideration, Plaintiff requested a hearing which was held before Administrative Law Judge Cheryl M. Rini (ALJ) on August 27, 1996. Tr. at 44–84. A supplemental hearing was held January 8, 1997. Tr. at 85–96. Although advised of her right to be represented at the hearings, Plaintiff chose to appear unrepresented. Tr. at 47 & 87. The ALJ issued a Notice Of Decision—Unfavorable on August 12, 1997. Tr. at 471–86. Plaintiff requested review by the Appeals Council on September 21, 1997. Tr. at 487–88. On August 28, 1998, an attorney sent an appearance to the Appeals Counsel along with written argument and new medical evidence. Tr. at 491–93 & 494–526—new evidence. On November 5, 1998, the Appeals Council declined to grant review making the ALJ's decision the final decision of the Commissioner in this case. Tr. at 489–90. On December 30, 1998, Plaintiff filed a Complaint in this Court which was docketed as 1:98–cv–10071. On January 6, 1999, the Appeals Council vacated its previous action and remanded the case to the ALJ with instructions to consider the new medical evidence and to complete the administrative record including a new hearing. Tr. at 527–29. On March 25, 1999, the parties filed a joint motion to dismiss, and the case was dismissed on March 26, 1999. The new hearing was held on November 10, 1999, at which time Plaintiff was represented by her attorney. Tr. at 97–169. At this hearing, Plaintiff amended her alleged onset of disability date to October 22, 1996, the date of a car accident. Tr. at 103. The ALJ issued a new unfavorable decision on April 5, 2000. Tr. at 17–37. Plain-

tiff again asked for review by the Appeals Council May 3, 2000. Tr. at 14–16. The Appeals Council denied review on August 10, 2001. Tr. at 8–10. A Complaint was filed in this Court on October 3, 2001.

On June 13, 2002, after Plaintiff filed her brief, the Commissioner moved to remand for further development of the record. The Commissioner wrote:

Upon receipt of the Court's remand order, the Appeals Council will remand this case to the Administrative Law Judge (ALJ), who will be directed to reevaluate the report of treating physician, James R. Rochelle, M.D. Additionally, the ALJ will be directed to reevaluate the credibility of Plaintiff's subjective complaints and her maximum residual functional capacity. The ALJ will also be directed to reconsider the demands of Plaintiff's past relevant work as a day care worker and compare those demands with her maximum residual functional capacity. If the record establishes that Plaintiff cannot perform her past relevant work, the ALJ will obtain the testimony of a vocational expert to determine if she could perform work in the national economy. The ALJ will also consider the evidence contained in Plaintiff's subsequent application for benefits.

Plaintiff resisted the motion to remand arguing that the evidence in this case supports a reversal with an award of benefits. In her brief in resistance to the Commissioner's motion to remand, Plaintiff asserts that the subsequent application to which the Commissioner referred, resulted in an award of benefits without the need of a hearing. Having reviewed the evidence of this case in detail, the Court agrees with Plaintiff that further administrative proceedings will only delay the receipt of benefits to which Plaintiff is entitled and that an award of benefits is the appropriate remedy.

## MEDICAL EVIDENCE

On May 28, 1987, Plaintiff was seen at the emergency room of Jennie Edmundson Hospital after having been kicked in the left side of her ribs by a 7 year old patient for whom she was caring. Although the Court has read all of the medical reports in this record concerning this incident, a detailed summary of them is neither relevant nor necessary given the fact that Plaintiff amended her alleged onset of disability date to October 26, 1996, the date on which she was involved in a car accident. Suffice it to say here that after the injury to her ribs, Plaintiff continued to experience chest pain which was determined to be due to musculoskeletal strain rather than from a cardiac impairment. In addition, Plaintiff was treated for left carpal tunnel syndrome. Medical evidence established that in spite of this injury, Plaintiff was able to lift up to 20 pounds. She was also able to stand, walk, and sit normally. *See, e.g.* Tr. at 409 & 440 (reports of medical examinations to determine Plaintiff's residual functional capacity).

According to an office note by James R. Rochelle, M.D. dated November 26, 1996, Plaintiff had been involved in an automobile accident on October 22, 1996. Plaintiff had been struck when another driver went through a stop light. Plaintiff reported pain in her low back and left leg and in her neck. There was positive straight leg raising on the left and negative on the right. Plaintiff's gait was characterized by short steps due to apparent back and neck pain. The doctor noted marked limitation of motion. There was muscle spasm in the cervical spine. The diagnoses were cervical strain, lumbar strain, and rule out bulging or herniated discs or other nerve root entrapment. The doctor also stated that as a result of the accident, Plaintiff had a ganglion cyst on her right wrist which was moderately painful and which caused a

decrease in her grip strength. An MRI was scheduled for November 29, 1996. Tr. at 463. The MRI showed mild degenerative change in the cervical spine, no compression of neural elements in the cervical spine, degenerative change at L5–S1, and no compression of neural elements evident in the lumbar spine. Tr. at 466. Plaintiff was seen by Benjamin Z. Rosario, M.D. at the Pain Management Center between November 29, 1996 and January 11, 1997. Tr. at 450–62. Dr. Rosario's reports, like many reports in this record, are hand written and difficult to read. On January 11, 1997, Dr. Rosario wrote that Plaintiff's pain was 7–8 on a scale of 0–10. Plaintiff had undergone a series of 3 epidural steroid injections (Tr. at 452, 453, 454). Tr. at 451. Plaintiff underwent an epidural injection of her low back on January 25, 1997. Tr. at 514. On March 14, 1997, Plaintiff underwent parafacet joint block at L3–L4, L4–L5, and L5–S1 on the left side and selective spinal nerve root epidurogram and block at L4 and L5 on the left. Tr. at 509. Plaintiff underwent another low back injection on May 5, 1997. Tr. at 505. A third low back injection was carried out on June 9, 1997. Tr. at 504. On September 24, 1997, Dr. Rosario wrote a prescription for a walking cane. Tr. at 498. Plaintiff underwent an injection of her cervical spine on October 20, 1997. Tr. at 497.

An office note dated August 31, 1998, from Dr. Rochelle states that Plaintiff continued to have significant low back pain and that the injections had not been of much help. The doctor noted that Plaintiff was on several pain medications including Flexeril, antidepressant medication Pepcid, and other medication prescribed by Dr. Rosario. The doctor wrote that the lumbosacral pain radiated down both legs, more so on the right. He said that Plaintiff walks "in a markedly antalgic [2] fashion,

having limited range of motion because of back pain." The doctor's physical examination showed limited range of motion in both the cervical and lumbar areas of the spine. Tr. at 536.

On November 2, 1998, Dr. Rochelle wrote a report in which he stated that Plaintiff had reached maximum medical improvement following the injuries sustained in the accident of October 22, 1996. The doctor wrote that although some of Plaintiff's degenerative changes may have pre-dated the accident, it could be said that "... the automobile accident indeed caused significant back and neck pain problems, which continue to this day." Tr. at 533. The doctor stated several times in his report that Plaintiff had significant pain in her lumbosacral region with radiation down both legs, more so on the right. He also said that Plaintiff had noted some improvement in the cervical spine pain. Regarding Plaintiff's permanent restrictions, Dr. Rochelle wrote:

> I would restrict her to no more than five to ten pounds of lifting and carrying occasionally. Also, she is unable to stand and walk for long periods of time, no more than 15 to 30 minutes at a time, no more than one to two hours during an eight hour work day.
>
> She is also limited from sitting for long periods of time. Nothing more than 30 to 60 minutes at a time. It is doubtful that she can function in a work situation, even with a job that allowed her to change position between standing and walking. Her current pain level of 5 to 9 on a scale of 0–10 requires that she take significant pain medication and muscle relaxant medication during the day. Thus, I do not believe that she could function in a sitting capacity for more than three to four hours total dur-

---

**2.** a characteristic gait resulting from pain on weight bearing in which the stance phase of gait is shortened on the affected side. Stedman's Medical Dictionary, 27th Edition.

ing a work day. I would restrict her from any significant bending, stooping, squatting, crawling or kneeling.

The doctor concluded his report by opining that Plaintiff's prognosis was for continued chronic pain into the indefinite future. Tr. at 534.

On July 27, 1999, at the request of the Social Security Administration, Plaintiff was seen by Clifford K. Boese, M.D. Tr. at 540–41. After a review of Plaintiff's history and a physical examination, Dr. Boese diagnosed chronic pain syndrome. Dr. Boese opined that Plaintiff could lift a maximum of 20 pounds infrequently and a maximum of 5 pounds frequently. He said that Plaintiff's standing or walking should be limited to 30 minutes each hour during the work day, and that her sitting should be similarly limited. The doctor said that climbing, balancing, stooping, crouching, kneeling or crawling was prohibited. He said that there were no restrictions on reaching, handling, feeling, pushing, pulling, seeing, hearing or speaking. And, no restrictions regarding dust, noise, fumes, humidity or vibration. Although there were no restrictions regarding machinery, he said Plaintiff should avoid heights. Tr. at 541.

## ADMINISTRATIVE HEARINGS AND DECISIONS

Plaintiff appeared at a hearing on August 27, 1996. Tr. at 44–84. Because the ALJ was of the opinion that the medical record was not adequately developed, the hearing was adjourned so that a consultative examination could be arranged. The hearing was reconvened on January 8, 1997. Tr. at 85–96. Plaintiff told the ALJ

that she had been in the auto accident on October 22, 1996. Tr. at 89. Plaintiff told the ALJ that she was seeing doctors Rochelle and Rosario. Tr. at 93.

In the decision dated August 12, 1997, the ALJ found that Plaintiff's impairments—musculoskeletal chest pain, mild degenerative disc disease, and mild degenerative arthritis of the spine—were not severe impairments within the meaning of the second step of the sequential evaluation and that Plaintiff was, therefore, not disabled. Tr. at 482–83.

Plaintiff appeared before the ALJ again on November 10, 1999. Tr. at 97–169. At the hearing, Plaintiff, through her counsel, amended the onset of disability to the date of the auto accident, October 22, 1996. Tr. at 103.

At the time of the hearing Plaintiff was 49 years old. Plaintiff said that she had completed the 11th grade and later obtained a GED. She also took some college courses to become a home health aide. Tr. at 104. Plaintiff had worked as home health aide for two years. Plaintiff said that the job required her to lift up to 30 pounds. Tr. at 105. She also said that she had to be on her feet for more than two hours a day. For a year and a half to two years, Plaintiff was as a day care worker. This was a part time job—25 to 30 hours per week[3]. Plaintiff said that she only lifted 10 pounds and did most of the work sitting on the floor with the children. She said that if the children had to be put onto a table to have diapers changed, or into a high chair, someone else did the lifting. She said that most of the

---

3. In 1995, Plaintiff earned $819.58 working at St. Mark's United Methodist Church. In 1996, she earned $3,538.66 working at the church. No earnings were posted for 1997 or 1998. Tr. at 531. Plaintiff began working at St Mark's in October of 1995, although the actual date is not written. Tr. at 238. Assuming, however, that in 1995 Plaintiff worked through the entire month of October, her earnings averaged $273.19. Even if she worked only 2 months in 1995, her earnings averaged $409.79. Plaintiff's earnings in 1996 averaged $353.86.

time, she sat in a chair or on the floor and rocked the babies. Tr. at 106. Plaintiff also had a part time job as a fast food worker. She said that the fast food job required her to be on her feet while working, but that periods of work would only last about an hour at a time after which she could sit in a break area. Tr. at 107.

In response to a question from the ALJ, Plaintiff's attorney said that the conditions upon which disability was being claimed were the injuries to the low back and neck sustained during the car accident which resulted in pain, fatigue, and physical limitations.

Plaintiff testified that in addition to medication (see Tr. at 537—medication list submitted prior to the hearing[4]), she uses a TENS unit to relieve her pain. Tr. at 119. She said that sometimes her pain medication makes her feel "doped up," but that "you have to put up with that in order to get the pain to ease up." Tr. at 129.

When asked about her daily activities, Plaintiff said she can stand for 10 or 15 minutes to wash some dishes or fix a meal. She said that her son does the laundry. She said that her son, her sister or her mother takes her to the store to shop. After a trip to the store, "I usually go home and have to lay down because my back hurts so bad I can't handle it." Plaintiff said she was still using the cane that had been prescribed for her. Tr. at 121. She said that she has a handicapped parking permit for her car. Plaintiff said she can stand for about 15 minutes and that when shopping, she usually needs to sit down before the trip is completed because of back pain. Tr. at 122. Plaintiff

estimated that the heaviest thing she can carry is a half gallon of milk and that she needs to use both hands. Plaintiff said she can only sleep for about 4 hours at a time after which she wakes up in pain. Tr. at 123. Plaintiff said she can only sit for a half hour at a time. She said that she alternates her sitting and standing throughout the day. Tr. at 124. She said that she cannot walk up or down stairs. Tr. at 125. Plaintiff said that she likes to sew, but that it is difficult to complete projects because she can't stay in one position for any length of time. Tr. at 126. In order to relieve pain, Plaintiff said she needs to lay down for 15 or 20 minutes every 3 to 4 hours. Tr. at 129. In response to a specific question from the ALJ, Plaintiff said she spends about 2 hours, off and on, lying down throughout the day. Plaintiff said the limitations she testified to had remained consistent since the car accident. Tr. at 130. Near the conclusion of her testimony, counsel pointed out that Plaintiff had been standing, sitting, and shifting around. Tr. at 147. He asked Plaintiff if she was in a lot of pain and she responded: "Yes, I am."

Counsel offered to call Plaintiff's sister to testify regarding her observations of Plaintiff's limitations. Tr. at 148. The ALJ responded: "I don't think so, Counsel. I think, if all she'll testify to is to corroborate what the Claimant is saying, I don't feel that is necessary." Tr. at 148–49.

The ALJ called Deborah Determan to testify as a vocational expert. Tr. at 149. The vocational expert prepared a past relevant work summary on which 3 past jobs were listed. Two of the jobs—home

---

4. This form states that Plaintiff is taking Pamelor which, according to the Physician's Desk Reference (PDR) is nortriptyline, a tricyclic antidepressant. At the hearing, Plaintiff testified she was taking Celexa which is a medication "... with a chemical structure unrelated to that of other selective serotonin reuptake inhibitors or of tricyclic, tetracyclic, or other available antidepressant agents." Also listed is Lorcet 10/650 which the PDR states is Hydrocodone Bitartrate 10mg and Acetaminophen 650mg. Hydrocodone bitartrate is an opioid analgesic and antitussive medication.

health aide and day care worker—were noted to be semi-skilled jobs. The "acquired skills" for each of the jobs were: "Understand and follow instructions exactly in caring for those who depend on you. Talk and relate to sick or handicapped." The job of fast food worker was an unskilled job. Tr. at 564. The ALJ asked the vocational expert whether Plaintiff's acquired work skills would transfer to other light or sedentary semi-skilled jobs. The vocational expert responded: "Other occupational areas that would be in a similar SVP (specific vocational preparation) area would be child care workers, early childhood teaching assistants, and teaching aide." Tr. at 150. The vocational expert testified that if Plaintiff were limited to light or sedentary work, she could do fast food work but that there would be no work available that related to the home health aide work. When asked about the numbers of the jobs related to child care, the vocational expert said there were four occupational titles one of which was unskilled, two had an SVP of 3 and one an SVP of 4. None of the jobs were identified by Dictionary of Occupational Titles (DOT) numbers. Tr. at 151. Later in the hearing, the vocational expert said there were two types of teaching assistant jobs: early childhood teaching assistant, half of which would have an SVP of 3 and would be done at the light exertional level; and, teacher's aide was listed with an SVP of 3 and sedentary exertional level. Tr. at 155.

The ALJ asked several hypothetical questions. In the first one, it was assumed that the individual could lift 20 pounds occasionally and 10 pounds frequently; could stand and walk, and sit for at least 6 hours a day; no push/pull limitations, but can not climb ladders or ropes, but can occasionally climb stairs; all other postural maneuvers could be done on a frequent basis; no manipulative, visual, or communicative limitations; cannot work on wet, slippery or uneven surfaces. Tr. at 155–56. In response, the vocational expert said the jobs cited in response to the question about transferable skills could be performed. She also said that there would be unskilled jobs but did not list any examples. Tr. at 156. The second hypothetical was the same as the first, but assumed that the individual could only stand/walk or sit for an hour at a time after which the position would need to be changed for five minutes. Tr. at 156–57. In response, the vocational expert said the same jobs were possible. Tr. at 157. In the next hypothetical, the individual could only lift 10 pounds frequently and small objects frequently, and the total time of sitting or standing was reduced to 2 hours. In response, the vocational expert said that all jobs except teacher aide would be eliminated. She also said that there would be unskilled work available but did not list examples of any jobs. Tr. 158–59. Next, the vocational expert was asked to consider that with the option to sit or stand, the individual could only stand/walk, or sit for a half hour at a time after which there would be the need to change position for 5 minutes. Tr. at 161. In response, the sedentary teacher aide job was available and the vocational expert mentioned jobs such as surveillance system monitor, security guard, cashiers, information clerk, and parking lot attendant. She said that all of these jobs allow for the option of sitting or standing. Tr. at 161–62. In response to a question that assumed that Plaintiff's testimony was credible (Tr. at 164), the vocational expert said that the need to lay down in excess of 2 hours per day would eliminate competitive employment. Tr. at 165.

In the decision dated April 5, 2000 (Tr. at 17–37), following the familiar five step sequential evaluation[5], the ALJ found that

---

**5.** The Social Security Act, and the regulations

which implement the Act provides for a se-

Plaintiff has not performed substantial gainful activity since October 22, 1996. At the second step, the ALJ found Plaintiff's severe impairments to be mild degenerative disc disease and arthritis of the lumbar spine, chronic cervical and low back pain, and musculoskeletal chest pain. None of these impairments were found to meet or equal a listed impairment which would have resulted in a finding of disability at the third step. Tr. at 33. At the fourth step, the ALJ found that Plaintiff "is able to perform her past relevant work as a teacher's aide as typically performed in the regional and national economies at the sedentary level of exertional demands...." The ALJ, therefore, found that Plaintiff was not disabled and not entitled to the benefits for which she had applied. Tr. at 34. In making the fourth step finding, the ALJ found that Plaintiff has the residual functional capacity to:

> lift/carry 10 pounds occasionally and small objects frequently; no climbing of ladders, ropes or scaffolds; and can perform only occasional climbing of stairs. While the Claimant can stand/walk at least 2 hours and sit for at least 6 hours in an 8–hour work day, she requires a sit/stand option such that she can stand or walk only one-half hour at a time, but then must be able to sit down for a few minutes (not to exceed 5 minutes) before resuming another 30–minute cycle of standing or walking. Additionally the Claimant can only sit 30 minutes at one time, and then must be able to move

about, either standing or walking for a few minutes (not to exceed 5 minutes) before resuming another 30–minute cycle of sitting.

Tr. at 33.

## DISCUSSION

The scope of this Court's review is whether the decision of the Secretary in denying disability benefits is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g). *See Lorenzen v. Chater*, 71 F.3d 316, 318 (8th Cir.1995). Substantial evidence is less than a preponderance, but enough so that a reasonable mind might accept it as adequate to support the conclusion. *Pickney v. Chater*, 96 F.3d 294, 296 (8th Cir.1996). We must consider both evidence that supports the Secretary's decision and that which detracts from it, but the denial of benefits shall not be overturned merely because substantial evidence exists in the record to support a contrary decision. *Johnson v. Chater*, 87 F.3d 1015, 1017 (8th Cir.1996) (citations omitted). When evaluating contradictory evidence, if two inconsistent positions are possible and one represents the Secretary's findings, this Court must affirm. *Orrick v. Sullivan*, 966 F.2d 368, 371 (8th Cir.1992) (citation omitted).

*Fenton v. Apfel*, 149 F.3d 907, 910–11 (8th Cir.1998).

---

quential evaluation process to determining disability. *See* 20 C.F.R. §§ 404.1520 and 416.920. During the five-step process, the ALJ considers whether the claimant is gainfully employed, the claimant has a severe impairment, the impairment meets the criteria of any of the listed impairments, the impairment prevents the claimant from performing past relevant work, and if the impairment prevents the claimant from doing any other work. See *Ramirez v. Barnhart*, 292 F.3d 576, 580 (8th Cir.2002). If the claimant is

engaged in substantial gainful activity, does not have a severe impairment, can do past relevant work, or if other work is available, benefits must be denied. On the other hand, if a claimant meets or equals a listed impairment, or if, at the fifth step, no other work is available for someone with the residual functional capacity, age, education, and work background of the claimant, benefits are awarded. *See, e.g. Lauer v. Apfel*, 245 F.3d 700, 703 (8th Cir.2001).

In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record. *Wilcutts v. Apfel*, 143 F.3d 1134, 1136–37 (8th Cir.1998) citing *Brinker v. Weinberger*, 522 F.2d 13, 16 (8th Cir.1975). The *Brinker* Court cited *Yawitz v. Weinberger*, 498 F.2d 956, 957 (8th Cir.1974) in which the Court wrote:

> However, as was stated by the Ninth Circuit in *Ainsworth v. Finch*, 437 F.2d 446, 447 (9th Cir.1971):

> "While we are not to try the claim de novo, 'this does not mean that it was intended that the courts should abdicate their conventional judicial function to review,' *McMullen v. Celebrezze*, 335 F.2d 811, 814 n. 4 (9th Cir.1964). We cannot escape our duty 'to scrutinize the record as a whole to determine whether the conclusions reached have a reasonable basis in law.' *Hicks v. Gardner*, 393 F.2d 299, 302 (4th Cir.1968). *See also Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 487–488, 71 S.Ct. 456, 95 L.Ed. 456 (1951); *Celebrezze v. Bolas*, 316 F.2d 498, 501 (8th Cir.1963)."

As stated above, Plaintiff was awarded benefits on a subsequent application. This review, therefore, is limited to the period of time between the alleged onset of disability, October 22, 1996, and the later award of benefits. *Hildebrand v. Barnhart*, 302 F.3d 836, 838 n. 1 (8th Cir.2002).

■■■ The ALJ denied Plaintiff's claim on the basis that Plaintiff is able to do her past relevant work as a teacher's aide. This finding is not supported by any substantial evidence in the record. In the first place, Plaintiff has never worked as a teacher's aide. Plaintiff worked on a part time basis at St. Mark's United Methodist church's day care center rocking babies. This job does not meet the regulatory definition of past relevant work. To be past relevant work, the work must have been done within the last 15 years, have been done long enough to learn the job, and have been substantial gainful activity. *Vincent v. Apfel*, 264 F.3d 767, 769 (8th Cir.2001) citing 20 C.F.R. § 416.965(a). In order for work to be considered substantial gainful activity, the regulations require that earnings from such work exceed $500.00 per month. 20 C.F.R. § 416.974(b)(2)(vii). Whether Plaintiff worked at the day care center for two or three months in 1995, and assuming that Plaintiff worked the better part of 10 months in 1996 until the day of her car accident after which the ALJ found she had not engaged in SGA, Plaintiff earnings never exceeded $500.00 per month. *See* footnote 3 above; *see also Vincent v. Apfel*, 264 F.3d at 769 (claimant's earnings should be averaged over only months worked).

Plaintiff's work at the day care center, therefore, is not part of her past relevant work from which she has developed skills which can transfer to other semi-skilled work. Furthermore, there is no evidence in this record that Plaintiff's day care work provided her with any skills whatsoever. The vocational expert said this job was classified by the DOT code 359.677–018. Tr. at 564. This job is described in the DOT as that of a nursery school attendant, also known as child-care leader, child-day-care center worker, and day care worker. The DOT says that such a worker:

> Organizes and leads activities of pre-kindergarten children in nursery schools or in playrooms operated for patrons of theaters, department stores, hotels and similar organizations: Helps children remove outer garments. Organizes and participates in games, reads to children, and teaches them simple painting, drawing, handwork, songs, and similar activities. Directs children in eating, resting, and toileting. Helps children develop habits of caring for own clothing and picking up and putting away toys and

books. Maintains discipline. May serve meals and refreshments to children and regulate rest periods. May assist in preparing food and cleaning quarters.

There is no evidence in this record that Plaintiff did any of the above enumerated duties. Rather, she rocked babies. As Judge Heaney pointed out in *Fines v. Apfel,* 149 F.3d 893, 896 (8th Cir.1998), "skill" is defined as knowledge of work activity which requires the exercise of significant judgment that goes beyond the carrying out of simple job duties and is acquired through the performance of an occupation which is above the unskilled level. Plaintiff's duties rocking babies, part time, at a day care center is hardly the kind of activity from which transferable skills are obtained. The vocational expert did not point to anything that Plaintiff learned in her work and state to which jobs those learned skills might transfer. Rather, the vocational expert simply found examples of other jobs with a similar specific vocational preparation time. In the opinion of the Court, this is not sufficient to meet the Commissioner's burden.

20 C.F.R. § 416.986(d) [6] states:

(d) *Skills that can be used in other work (transferability)*-(1) *What we mean by transferable skills.* We consider you to have skills that can be used in other jobs, when the skilled or semi-skilled work activities you did in past work can be used to meet the requirements of skilled or semi-skilled work activities of other jobs or kinds of work. This depends largely on the similarity of occupationally significant work activities among different jobs.

(2) *How we determine skills that can be transferred to other jobs.* Transferability is most probable and meaningful among jobs in which -

(i) The same or a lesser degree of skill is required;

(ii) The same or similar tools and machines are used; and

(iii) The same or similar raw materials, products, processes, or services are involved.

Since the only evidence of job duties Plaintiff performed at the day care center was rocking babies, she did not use any skills that can be transferred to other semi-skilled work activity. Plaintiff did not do any of the duties described in the DOT under the heading of day care worker. The testimony of the vocational expert that Plaintiff has transferable skills, therefore, is not substantial evidence on the record as a whole. *See Porch v. Chater,* 115 F.3d 567, 571 (8th Cir.1997) (when vocational expert testimony conflicts with the DOT, and the DOT classifications are not rebutted, the DOT controls).

The other jobs which Plaintiff had performed, home health aide (which in the opinion of the Court is the only job properly classified as past relevant work), and fast food worker, were both eliminated because of the exertional demands of those jobs. Likewise, the vocational expert testified that any skills Plaintiff may have acquired from her work as a home health aide were not usable because of her exertional restrictions. Plaintiff, therefore, is unable to do any of her past work, and she has no transferable skills. The only remaining issue is whether Plaintiff has the residual functional capacity to do other work.

The ALJ found that Plaintiff is limited to lifting a maximum of ten pounds and frequently lifting small objects. The ALJ found that Plaintiff can stand and walk only 2 hours of a work day, but that she can sit for at least 6 hours of the work day.

---

**6.** The comparable regulation for Title II benefits is found at 20 C.F.R. § 404.1568.

This is consistent with the definition of sedentary work. 20 C.F.R. § 416.967(a). If Plaintiff, having demonstrated she is incapable of performing her past relevant work, is limited to unskilled sedentary work, she is entitled to a finding of disability by virtue of rule 201.14 of the medical vocational guidelines at age 50. Plaintiff, however, was 49 at the time of the hearing on November 10, 1999, and 44 years old on October, 22, 1996, the onset of her disability.

In the record before the ALJ was a medical report written by Plaintiff's treating physician James R. Rochelle, M.D. dated November 2, 1998, regarding the effects of the accident of October 22, 1996. Dr. Rochelle stated that Plaintiff had reached maximum medical improvement. He said that although Plaintiff could lift up to 10 pounds, he opined that Plaintiff is unable to work in a sitting position more than three or four hours of a work day. As a result, the doctor was of the opinion that Plaintiff would not be able to function in a job even if she were allowed to change her position between sitting, standing and walking. In support of his opinion, the doctor referred to the "significant pain medication and muscle relaxant medication" being taken by Plaintiff to control her pain. Dr. Rochelle stated that Plaintiff's level of functioning was expected to last into the indefinite future.

■ In *Smallwood v. Chater*, 65 F.3d 87, 89 (8th Cir.1995), the Court wrote that medical opinions on how many hours a claimant can work are not only permitted, they are encouraged. *Smallwood* also states, as the Court of Appeals has said in numerous cases, that the opinion of a treating physician controls if it is well-supported by medically acceptable diagnostic techniques and is not inconsistent with other substantial evidence in the record. The only contrary medical opinion on the issue of residual functional capacity

after the car accident was expressed by Dr. Boese who saw Plaintiff on July 27, 1999, at the request of the Social Security Administration. It is well settled law that such a report is not substantial evidence. *Lauer v. Apfel*, 245 F.3d 700, 705 (8th Cir.2001) (even if a consulting physician examines a claimant once, his or her opinion is not considered substantial evidence, especially if, as here, the treating physician contradicts the consulting physician's opinion). Furthermore, at step five of the sequential evaluation, the Commissioner bears the burden of proving that a claimant can work full time. *Bladow v. Apfel*, 205 F.3d 356, 359 (8th Cir.2000)(at step 5, only an ability to do full-time work will permit the ALJ to render a decision of not disabled); *see also McCoy v. Schweiker*, 683 F.2d 1138, 1147 (8th Cir.1982)(en banc)(the residual functional capacity which must be found is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world).

■ In the case at bar, substantial evidence on the record as a whole supports a finding that Plaintiff is unable to do her past relevant work and that she has no transferable skills. Substantial evidence also supports a finding that Plaintiff is limited to the exertional demands of sedentary work but that she is unable to do so on a full-time basis because of pain, fatigue, and the side effects of medication. Only one conclusion, therefore, is possible based on substantial evidence in this record—from and after October 22, 1996, Plaintiff has been disabled and entitled to the benefits for which she applied. A remand to take additional evidence would only delay the receipt of benefits to which she is entitled. In such circumstances, a reversal with an award of benefits is the appropriate remedy. *Gavin v. Heckler*,

811 F.2d 1195, 1201 (8th Cir.1987). *See also, Hutsell v. Massanari,* 259 F.3d at 714 (when the clear weight of the evidence points to a conclusion of disability, an order granting benefits is appropriate). In *Seavey v. Barnhart,* 276 F.3d 1, 11–12 (1st Cir.2001), Plaintiff argued that he should be awarded benefits because the Commissioner had not met her burden of proof with vocational expert testimony and she should not be given another opportunity to do so. The Court found that such an approach was inconsistent with the dictates of 42 U.S.C. § 405(g) and with the approach generally taken when reviewing administrative actions. Rather, wrote Judge Lynch:

> [I]f the evidence and law compelled one conclusion or the other, then the court could order an award of benefits or affirm a denial of benefits. For example, a judicial award of benefits would be proper where the proof of disability is overwhelming or where the proof is very strong and there is no contrary evidence. (Citation omitted) Similarly, if correcting the legal error clarified the record sufficiently that an award or denial of benefits was the clear outcome, then the court may order or affirm denial. Conversely, if an essential factual issue has not been resolved, as here, and there is no clear entitlement to benefits, the court must remand for further proceedings. A number of circuits appear to have adopted this view.

In the case at bar, the evidence compels only one conclusion, Plaintiff is disabled and entitled to the benefits for which she applied.

## CONCLUSION AND DECISION

It is the holding of this Court that Commissioner's decision is not supported by substantial evidence on the record as a whole. The Court finds that the evidence in this record is transparently one sided against the Commissioner's decision. *See* *Bradley v. Bowen,* 660 F.Supp. 276, 279 (W.D.Ark.1987). A remand to take additional evidence would only delay the receipt of benefits to which Plaintiff is entitled.

Defendant's motion to remand for further administrative proceedings is denied. **This cause is remanded to the Commissioner for computation and payment of benefits.** The judgment to be entered will trigger the running of the time in which to file an application for attorney's fees under 28 U.S.C. § 2412(d)(1)(B) (Equal Access to Justice Act). *See Shalala v. Schaefer,* 509 U.S. 292, 113 S.Ct. 2625, 125 L.Ed.2d 239 (1993). *See also, McDannel v. Apfel,* 78 F.Supp.2d 944 (S.D.Iowa 1999), and LR 54.2(b).

IT IS SO ORDERED.